IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | **Case No. 4:20cr00018** |
| : | |
| **ALAN JAX WAGONER** : | |

### UNITED STATES' MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

COMES NOW the United States of America, by counsel, and respectfully opposes the motion to suppress filed by defendant Alan Jax Wagoner. Counsel for Wagoner claims the Henry County Sheriff's Office (HCSO) unlawfully searched the cab of his pickup truck and found two firearms under the seat before obtaining a search warrant. In his motion, counsel for Wagoner asserts that the officers physically entered the cab of his truck with the intent to look around and had no probable cause to do so. Wagoner, through his counsel, further claims that no firearms were found in plain sight. Instead, he represents to the court that one firearm was "stuffed under Alan's driver seat, not observable from outside," and that another was found in the cab "after searching further." Mot. to Suppress, ECF No. 64, at 6. The government believes the evidence will show that these factual representations are unsupported.

Additionally, counsel for Wagoner conveniently fails to mention anywhere in his motion that in addition to the two firearms in the cab, there were eight burnt firearms and hundreds of rounds of ammunition in the exposed, open-air bed of Wagoner's pickup truck. The government expects the evidence to show, consistent with the entirety of the discovery

1

materials provided to Wagoner, that HCSO deputies obtained a search warrant based on their plain-view observation of these firearms and ammunition in Wagoner's truck bed and the two firearms under the driver's seat inside the cab, as well as their knowledge of Wagoner's felony status.

Wagoner twists the narrative to suit his argument, notwithstanding the actual facts. His motion is grounded neither in law or in fact, and it should be denied. In support thereof, the government respectfully states as follows:

## FACTUAL AND PROCEDURAL HISTORY

At the July 1, 2021 evidentiary hearing, the government's witnesses are expected to testify generally to the following facts. On January 26, 2020, around 2:00 a.m., deputies from HSCO responded to the area of Barker Road in Axton, Virginia, following a report of a suspicious person and vehicle. When they arrived on scene, they observed a white Dodge pickup truck using a chain to tow a gray van on Barker Road, followed closely by a Cadillac. The van matched the description of the reported suspicious vehicle. As the HCSO deputies turned around to catch up with the trio of vehicles, the Cadillac passed the truck and van and left the scene at a high rate of speed. Law enforcement observed the truck and the van cross the center yellow line of the two-lane road just before the van came loose from the truck and rolled to a stop on the side of the road. The white Dodge pickup continued to drive down Barker Road, dragging the chain as it sparked down the roadway. Lieutenant T.D. Hambrick activated his emergency lights and initiated a traffic stop on the truck. Wagoner was the driver and sole occupant of that vehicle, which also was registered to him.

Wagoner failed to stop for the emergency lights and, instead, pulled into a driveway at 775 Barker Road. He opened the driver's door of the pickup truck while traveling at approximately 10 mph, leading Lt. Hambrick to believe that he intended to flee. Lt. Hambrick pulled his marked patrol vehicle up near Wagoner's driver side door in an attempt to stop him from fleeing, but Wagoner stopped his truck and exited the vehicle on foot. He left the driver's side door open as he fled.

Wagoner ignored Lt. Hambrick's repeated commands to stop, placed his hands on his head, and began walking away. Wagoner then began running with his hands at his side. He continued to ignore the officer's directives. As a result, Lt. Hambrick pepper sprayed Wagoner in the face and forced him to the ground. Wagoner continued to struggle and resist while on the ground. Lt. Hambrick used a distraction technique with his right forearm to Wagoner's facial area. Wagoner persisted in his attempts to get up. Lt. Hambrick struck Wagoner two more times in the facial area with his right forearm before he complied. Wagoner then was taken into custody.

Both Lt. Hambrick and Sgt. Griffith are expected to testify that through the open driver's side door of Wagoner's pickup truck, with the use of a flashlight, they were able to see in plain view two firearms under the driver's seat in the cab while they were standing outside of the vehicle. The driver's seat sits off the floorboard, providing a clear view of the area underneath the seat.



Exhibit A.

In addition to the firearms in the cab, Lt. Hambrick and Sgt. Griffith also saw in plain view in the open bed of the pickup truck several burnt firearms and hundreds of rounds of ammunition. This is documented by Lt. Hambrick as follows in an incident report:

> I then went and checked Wagoner's truck to see if anyone else was in the truck. Wagoner had left the driver's door open on his truck. Under the driver's seat of the truck, I observed an assault rifle pistol and what appeared to be a 1911 pistol. In the bed of the truck, I observed several burnt firearms and hundreds of rounds of ammunition and an ammunition metal box. I contacted Gregory's Towing and seized the truck so that I could obtain a search warrant. Deputy Justin Robertson transported Wagoner to the magistrate's office.

Exhibit B.

Lt. Hambrick applied for a state search warrant based on his observations, as well as his knowledge of Wagoner's felony status. In his affidavit, he referenced the burnt firearms he observed in the bed of the pickup, along with hundreds of rounds of ammunition, as well as the two firearms he observed under the driver's seat:

> On January 26, 2020, I, Lieutenant T.D. Hambrick, initiated a traffic stop on a white Dodge Ram truck that was operated by Alan Jax Wagoner. The traffic stop occurred on the 700 block of Barker Road. While trying to stop the vehicle, Wagoner fled from the truck on foot. After taking Wagoner into custody, I observed several burnt assault-style rifles in the bed of the Dodge Ram truck along with hundreds of rounds of ammunition. Inside the truck, I observed a concealed assault rifle pistol and a 1911 pistol under the driver's seat of the truck. Wagoner is a convicted felon and cannot possess firearms or ammunition.

Exhibit C.

A search warrant was issued and executed on the truck. A total of 10 firearms and hundreds of rounds of ammunition, all of which displayed varying degrees of fire damage, were recovered. Among the firearms found in the truck was a short barrel shotgun. Wagoner is charged in a Second Superseding Indictment with being a felon in possession of multiple firearms and ammunition in violation of 18 U.S.C. § 922(g), and with possessing an unregistered weapon made from a shotgun in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871.

## ARGUMENT

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The constitutional protection against an unreasonable search is distinct from the protection against an unreasonable seizure. *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997). "'A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property.'" *Id.* (quoting *Horton v. California*, 496 U.S. 128, 133 (1990)).

The touchstone of the Fourth Amendment is reasonableness, *Riley v. California*, 573 U.S. 373, 381-82 (2014), and this reasonableness requirement generally requires law enforcement to obtain a warrant setting forth probable cause for a search or seizure. Over time, the Supreme Court has carved out "a few specifically established and well-delineated exceptions" to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is known as the plain-view doctrine.

While the plain-view doctrine is often thought of as an exception to the warrant requirement for searches, "this characterization overlooks the important difference between searches and seizures." *Horton v. California*, 496 U.S.128, 133 (1990).

> If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. A seizure of the article, however, would obviously invade the owner's possessory interest. If 'plain view' justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches.

*Id.* at 133–34 (internal citations omitted). The plain-view exception to the warrant requirement applies to seizures, not searches, and "authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *Jackson*, 131 F.3d at 1109.

**A. The deputies' observations of the firearms in plain view under the driver's seat and in the open bed of the pickup truck do not constitute a search under the Fourth Amendment.**

In his motion to suppress, Wagoner argues HCSO conducted an unlawful search of his pickup truck prior to applying for a search warrant. He claims "police went inside Alan's pickup with the intent to acquire information—to see what was inside. . . . And only once police were physically inside Alan's pickup were they able to see any firearms." Mot. to Suppress, ECF No. 64, at 3-4. This argument is premised on an inaccurate characterization of the facts;[1] as such, it has no basis in either fact or law. The government anticipates Lt.

---

[1] It is difficult for the government to understand how Wagoner reaches the interpretation of the facts he sets forth in his brief. Exhibits B and C, which previously were provided to defendant in discovery, plainly indicate Wagoner left his door open when he fled and Lt. Hambrick observed firearms under the driver's seat. These exhibits also document the fact that Lt. Hambrick observed firearms in the bed of the pickup truck—a fact ignored by defendant on brief. (cont.)

6

Hambrick and Sgt. Griffith will both testify at the July 1st evidentiary hearing that they did not enter the cab of Wagoner's truck to search until they had a warrant. Rather, standing outside of the truck, they were able to see in plain view two firearms under the driver's seat of the vehicle through driver's side door, which Wagoner had left open when he fled. "Viewing an article that is already in plain view does not involve an invasion of privacy and, consequently, does not constitute a search implicating the Fourth Amendment . . . ." *Jackson*, 131 F.3d at 1108; *Horton*, 496 U.S. 133 n.5 (observation of item left in plain view generally involves no Fourth Amendment search).[2]

Here, the officers were in a lawful position to view the firearms under the driver's seat while standing outside the open driver's side door. *See United States v. Brown*, No. 1:20CR00014, 2020 WL 6018897, at *4 (W.D. Va. Oct. 11, 2020) (Jones, J.) (holding deputy was in a lawful position to view the zipper case on driver's side floorboard while standing outside of open front driver's side door after defendant had fled on foot); *see also United States v. Cunningham*, 546 F. App'x 203, 207 (4th Cir. 2013) (district court did not err in crediting officer's testimony that he observed the firearm on the seat of the truck in plain view before opening the driver's side door, providing probable cause to conduct the warrantless search

---

Photographs of the truck in Exhibit A were taken in preparation for the July 1st evidentiary hearing; as such, they were not produced until after defendant filed his motion. Nevertheless, there is no suggestion anywhere in the evidence of this case that officers physically entered the cab of the truck prior to obtaining a search warrant. The government does not expect any evidence to support Wagoner's representations on brief that "none of their observations were made while standing outside of the truck." Mot. to Suppress, ECF No. 64, at 6.

[2] Indeed, "[t]he rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Warrantless seizure is appropriate under such circumstances because seeking a warrant from a neutral magistrate "would often be impracticable and would do little to promote the objectives of the Fourth Amendment." *Id.*

7

and seize the loaded firearm). The officers' use of a flashlight to illuminate the interior of the truck's cab does not change the constitutional calculus. *Texas v. Brown*, 460 U.S. 730, 739-40 (1983) (officer's "action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment."); *see also United States v. Dunn*, 480 U.S. 294, 305 (1987) ("officers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search within the meaning of the Fourth Amendment"). Nor does the fact that the officers might have shifted position from their vantage point standing outside the truck or bent down to see what was under the seat. *Texas*, 460 U.S. at 740 (fact that officer "changed [his] position" and "bent down at an angle so [he] could see what was inside" defendant's car is irrelevant to Fourth Amendment analysis). HCSO did not conduct a search of the cab within the meaning of the Fourth Amendment when officers standing outside the truck pointed a flashlight at the open door.[3]

Wagoner fails to mention the fact that HCSO saw numerous other firearms in the open bed of the pickup, in addition to the two under driver's seat, from where the deputies stood outside the truck. This likewise does not qualify as a Fourth Amendment search.

---

[3] Wagoner's reliance on *United States v. Jones*, 565 U.S. 400 (2012), is misplaced. In *Jones*, the Supreme Court held that the government's installation of a GPS tracking device on a target's vehicle was a search within the meaning of the Fourth Amendment, finding the government physically intruded on a constitutionally protected area with the intent to obtain information. Wagoner's reliance on *Jones* and his corresponding line of argument is premised on the inaccurate factual assertion that HCSO deputies physically entered the cab of Wagoner's truck to conduct a search. *See* Mot. to Suppress, ECF No. 64, at 3-4. The government expects the evidence to show that there was no physical intrusion here.

Likewise, the Fourth Circuit's opinion in *United States v. Davis*, 997 F.3d 191 (4th Cir. 2021), also relied on by defendant on brief, has no bearing on the analysis. In *Davis*, the court applied the holding in *Arizona v. Gant*, 556 U.S. 332 (2009), to the search of a backpack and concluded law enforcement can conduct warrantless searches of non-vehicular containers incident to a lawful arrest only when the arrestee is unsecured and within reaching distance of the container at the time of the search. 997 F.3d at 197. The *Davis* court further held the officers in that particular set of circumstances did not have probable cause to justify a warrantless search of *Davis'* vehicle pursuant to the automobile exception. But in Wagoner's case, HCSO did not conduct a warrantless search. The holdings in *Davis* are inapposite.

8

"There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Texas*, 460 U.S. at 740. Here, HCSO deputies standing next to the pickup truck were able to observe several firearms and hundreds of rounds of ammunition lying in the open-air bed of the truck. Wagoner has no reasonable expectation of privacy in the exposed bed of his pickup truck, which can plainly be viewed from outside the vehicle. *See United States v. Nunn*, 525 F.2d 958, 959 (5th Cir. 1976) (defendant cannot claim any reasonable expectation of privacy where illegal aliens were lying in truck's open bed). As the Supreme Court has noted, "the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public." *California v. Greenwood*, 486 U.S. 35, 41 (1988); *see also Katz*, 389 U.S. at 351. HCSO's plain-view observations of the firearms and ammunition in the pickup truck bed do not constitute a constitutional search.

### B. Wagoner does not have a reasonable expectation of privacy in his abandoned vehicle.

Not only does Wagoner lack a reasonable expectation of privacy in his firearms and ammunition observable in plain view, he abandoned any privacy interest when he left his vehicle and fled from law enforcement. "When a person voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress evidence seized from it." *United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005). Even if the defendant did not intend to relinquish all rights to the vehicle, abandonment "may be found when where a fleeing defendant 'relinquishes an object to make his flight easier.'" *United States v. Kirlew*, 291 F. App'x 536, 538 (4th Cir. 2008)

(quoting *United States v. Basinski*, 226 F.3d 829, 837 (7th Cir. 2000)). In *Kirlew*, the court found the defendant had no reasonable expectation of privacy in the contents of his vehicle when he jumped out of the still-moving vehicle and fled on foot, after having led police on a dangerous, high-speed chase. *Id.* at 538; *see also United States v. Hopkins*, 568 F. App'x 214, 216 (4th Cir. 2014) (holding that when defendant fled from police, "he abandoned the car, thereby forfeiting any privacy interest in the car or its contents").

Here, the defendant also opened the door of his still-moving vehicle and fled on foot, leaving the driver's side door ajar. Wagoner's actions indicate he abandoned any reasonable expectation of privacy in the contents of his vehicle. The Fourth Amendment protects property for which an individual has a subjective expectation of privacy and that expectation is "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring). Wagoner cannot argue he had a reasonable expectation of privacy in a vehicle he abandoned, leaving the door wide open, as he fled from police.

## C. Even if the deputies' observations did violate the Fourth Amendment, their actions were so close to the line of validity to make their belief in the validity of the subsequently issued warrant objectively reasonable and, as such, the good faith exception to the exclusionary rule should apply.

Lt. Hambrick and Sgt. Griffith's observations of the firearms and ammunition in plain view in the truck, coupled with the deputies' knowledge of Wagoner's felony status, would have justified warrantless search and seizure in this case.[4] But HCSO went a step

---

[4] Warrantless search of the entire vehicle and seizure of the contraband contained therein would have been valid under the automobile exception to the warrant requirement based on the deputies' observations of the firearms and ammunition. The automobile exception permits the government to conduct a warrantless search of a vehicle if there is probable cause that the car contains contraband. *United States v. Ross*, 456 U.S. 798, 809 (1982). The search may extend to every part of the vehicle and its contents where the object of the search may be found. *Id.* at 824-25. The automobile exception applies even where a defendant's vehicle has been rendered immobile, the rationale being that defendant's use of the readily mobile vehicle on public roads before the search sufficiently reduced his expectation of privacy (cont.)

10

further; Lt. Hambrick sought the added protection of a search warrant and applied to a magistrate. In his affidavit in support of that application, Lt. Hambrick references the firearms he observed in both the cab and bed of Wagoner's truck, as well as the fact that Wagoner is a convicted felon.[5] Relying on that warrant, the deputies executed a search of the truck and recovered a total of 10 firearms and hundreds of rounds of ammunition. Even if the deputies' initial observations of the firearms in Wagoner's truck could be construed to be unconstitutional, they conducted a search in good faith pursuant to a valid search warrant, and the *Leon* good faith exception to the exclusionary rule should apply.

The Fourth Amendment does not speak to the suppression of evidence obtained in violation of its commands; however, the exclusionary rule was created by the Supreme Court "to compel respect for the constitutional guaranty." *Davis v. United States*, 564 U.S. 229, 236 (2011) (citations and internal quotations omitted). The essence of the exclusionary rule is that evidence unlawfully obtained, including all derivative evidence flowing from it, should be suppressed. *Segura v. United States*, 468 U.S. 796, 804 (1984). "Exclusion is not a personal constitutional right, nor is it designed to redress the injury occasioned by an unconstitutional search." *Davis*, 564 U.S. at 236 (citations and internal quotations omitted). Rather, the exclusionary rule's sole purpose is to deter future Fourth Amendment violations. *Id.* at 236-

---

in the vehicle. *Brown*, 2020 WL 6018897, at *5. After HCSO observed contraband in plain view, the deputies could have conducted a lawful, warrantless search.

Likewise, warrantless seizure of the firearms and ammunition would have been justified under the plain-view doctrine. As previously discussed, the deputies were lawfully in a place from which the firearms and ammunition could be plainly viewed and had a lawful right of access, and the incriminating character of the contraband was immediately apparent. *Jackson*, 131 F.3d at 1109. Not only had Wagoner just fled from his moving vehicle during a traffic stop, Lt. Hambrick also knew from prior experience that Wagoner was a convicted felon. Warrantless seizure under these circumstances would have been lawful.

[5] Wagoner raises no argument with respect to the validity of the search warrant, aside from his argument that it was based on a prior illegal search. Mot. to Suppress, ECF No. 64.

11

37 (citations omitted). The Supreme Court has limited application of the rule to "situations in which this purpose is thought most efficaciously served," and "[w]here suppression fails to yield appreciable deterrence, exclusion is clearly . . . unwarranted." *Id.* (citations and internal quotations omitted).

In addition to requiring meaningful deterrence, "[a]pplication of the exclusionary rule also involves weighing the societal costs of applying the rule, because exclusion of evidence 'almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence.'" *United States v. Wilks*, 647 F.3d 520, 523 (4th Cir. 2011) (citing *Davis*, 564 U.S. at 237). As such, "[e]xclusion of evidence only is appropriate if the deterrence benefits of suppression outweigh the heavy societal costs of exclusion." *Id.*

In *Leon*, the Supreme Court announced an exception to the exclusionary rule, holding that the rule should not apply to evidence obtained by an officer who conducts a search in reasonable reliance on a search warrant that was issued by a neutral and detached magistrate, but is ultimately found to be unsupported by probable cause or otherwise defective. *United States v. Leon*, 468 U.S. 897, 920–22 (1984). The *Leon* Court explained that suppression is appropriate if (1) the magistrate was "misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) the magistrate "abandoned his judicial role" or neutrality; (3) the warrant was "so lacking in indicia of probable cause" as to render official belief in its existence unreasonable; or (4) the warrant was so "facially deficient" that it could not reasonably be presumed valid. *Id.* at 923.

The question presented in this case is whether the *Leon* good faith exception to the exclusionary rule can apply in a situation in which the affidavit supporting the search warrant is tainted by evidence obtained in violation of the Fourth Amendment. The Fourth Circuit does not appear to have addressed this issue, and other circuits are split. The Ninth and Eleventh Circuits have answered the question in the negative. *See, e.g., United States v. McGough*, 412 F.3d 1232, 1239-40 (11th Cir. 2005); *United States v. Wanless*, 882 F.2d 1459, 1466-67 (9th Cir. 1989). However, the Second, Fifth, Sixth and Eighth Circuits have all held that, under some circumstances, the good faith exception can still apply when the warrant affidavit relies on evidence obtained in violation of the Fourth Amendment. *See, e.g., United States v. Massi*, 761 F.3d 512, 527-32 (5th Cir. 2014); *United States. v. McClain*, 444 F.3d 556, 565 (6th Cir. 2005); *United States v. Fletcher*, 91 F.3d 48, 51-52 (8th Cir. 1996); *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985).

Reconciling the *Leon* good faith exception with the fruit of the poisonous tree doctrine, the court should likewise find under these unique circumstances that the good faith exception should apply even if the court were to determine the deputies' initial observations of the firearms and ammunition were unconstitutional. As the Sixth Circuit held in *McClain*, the facts surrounding Lt. Hambrick and Sgt. Griffith's initial observations were "close enough to the line of validity to make the officer's belief in the validity of the warrant objectively reasonable." 444 F.3d at 566 (quoting *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989)). There is no evidence the HCSO deputies knew they were violating the Fourth Amendment by standing outside of Wagoner's pickup truck and observing the firearms and ammunition through an open driver's side door and in an exposed bed. *See*

*Massi*, 761 F.3d at 528 ("What is important is that the officer presenting the information to a magistrate be objectively reasonable in concluding that the information being used to support the warrant was not tainted.").

They acted with good faith and, as such, the *Leon* exception should bar application of the exclusionary rule in this case. *Id.* In a case like this, where the deputies' conduct is objectively reasonable, "'excluding the evidence will not further the ends of the exclusionary rule in any appreciable way . . . .'" *Leon*, 468 U.S. at 920 (quoting *Stone v. Powell*, 428 U.S. 465, 539-40 (1976) (White, J., dissenting)).

## CONCLUSION

Lt. Hambrick and Sgt. Griffith's plain-view observations of the firearms under the driver's seat and in the exposed bed of Wagoner's pickup truck did not constitute an unconstitutional search. "[T]he eye cannot commit the trespass condemned by the Fourth Amendment." *McDonald v. United States*, 335 U.S. 451, 454 (1948). Moreover, Wagoner relinquished any reasonable expectation of privacy in his property when he fled the moving vehicle, leaving the door wide open. And even if the officers' initial observations could somehow constitute an unlawful search, their good faith reliance on the subsequently issued search warrant should bar application of the exclusionary rule under these unique circumstances.

For these reasons, the United States respectfully requests the court deny defendant's motion to suppress.

        Respectfully submitted,

        DANIEL P. BUBAR
        Acting United States Attorney

        s/Kristin B. Johnson
        Assistant United States Attorney
        VA Bar No. 71115
        310 1st Street SW, Suite 906
        Roanoke, VA 24011
        (540) 857-2250
        Kristin.Johnson2@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2021, I caused to be filed electronically this Brief in Opposition to Defendant's Motion to Suppress with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

        s/Kristin B. Johnson
        Assistant United States Attorney