IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

DANVILLE DIVISION

United States of America

    v.                                                            Criminal No. 4:20-CR-18 (EKD)

Alan Jax Wagoner

**Defendant's Reply to Government's Opposition to Motion to Suppress**

The government and its witnesses do not have a monopoly on facts or the truth. For the first time in a year and a half, police officers claim to have observed firearms in plain view of Mr. Wagoner's pickup and the bed of his truck. True, police earlier claimed to observe contraband, but they never described contraband as in *plain view*,[1] and they did not describe with any particularity what it is that they saw in the bed of Mr. Wagoner's pickup. For example, police clearly specify the type of weapons they claim to have seen in Mr. Wagoner's passenger compartment: an AR-style pistol and what appears to be a 1911 pistol. But when describing the firearms in the back of the pickup, police merely describe "several burnt firearms." What did they see? The stocks of guns? Barrels of guns? A rifle? None of the firearms found in the bed of the pickup were completely intact. All of them were burned, and parts of firearms more closely resembled scrap metal than firearms.[2] It is true that viewed independently, these objects clearly appear to be firearms (or were firearms at some point). But unclear is what police claim they saw in the bed of Mr. Wagoner's pickup.

---

[1] As described in the defendant's motion to suppress, police claimed in a report to rely on the protective sweep exception to the warrant requirement, not the plain view exception. If the firearms were in plain view, why did the officers not just say they were in plain view? And by the time that Lt. Hambrick searched the pickup, he was already informed that nobody else was inside the vehicle and that the vehicle contained firearms.

[2] See Exhibit A at 6—in which Agent Boccieri clearly indicates that an item found in the truck may or may not be contraband and documents his findings with details and photographs.

Did they see whole firearms, lock, stock, and barrel? Which of the recovered guns do police claim were visible? Little information was recorded about their observations.

Moreover, police never described the manner in which they claim to have observed the firearms in the bed of the pickup. The pickup was loaded with (what appears to be) hundreds of pounds of fire debris and dozens of random objects, nearly all of which had varying degrees of fire damage.[3] Police failed to document where they claim the firearms were among the wreckage. The defense does not know if police had to move items within the bed of the truck to see the firearms. Likewise, the defense does not know when police claim to observe firearms in the bed of the pickup (in the dark field or inside well-lit police garage). The fact that Mr. Wagoner's pickup had an open bed does not itself explain how police claimed to observe firearms inside it.

Police also claim to have seen hundreds of ammunition rounds, but they do not describe in any detail what they observed. Where were these items in relation to the fire debris? Did the officer observe loose ammunition strewn about the bed of the pickup, or was the ammunition inside containers? Much of the ammunition recovered from the vehicle was in vacuum-sealed baggies or in an ammunition box. But from reading the officer's report and request for a warrant, one would not know these important details. The lack of specificity in the officer's description of the items he claims were plainly visible contraband is a significant reason to question his claims. This lack of specificity is matched by a dearth of corroborating evidence that could have easily been obtained to substantiate the officers' claims, such as body or dash camera footage or photographs or videos. When all of the facts

---

[3] See Exhibit B—a photograph taken of Mr. Wagoner's vehicle in June of 2021, which still contains some of the items of scrap metal and other debris.

are considered together, the defense argues that the government cannot prove the officers' conduct was reasonable in searching Mr. Wagoner's pickup.[4]

If police manipulated objects within the bed of the truck to attempt to look for evidence of a crime, then they cannot claim the objects were in plain view. *See Arizona v. Hicks*, 480 U.S. 321, 328 (1987) (finding the plain view exception inapposite when police had to manipulate an object to uncover its serial number prior to them having probable cause). If police entered Mr. Wagoner's pickup to attempt to look for evidence, they cannot claim plain view. *See United States v. Jones*, 565 U.S. 400 (2012).

**There is no evidence that Mr. Wagoner abandoned his vehicle.**

The government cites unreported cases to support its argument that, because Mr. Wagoner "fled" from the police, he abandoned a reasonable expectation of privacy in his vehicle. *See* ECF. No. 68 at 9. Unlike a defendant who leaves a moving vehicle in the middle of a public

---

[4] On July 1, prior to Mr. Wagoner's pretrial conference, the court called counsel into chambers. During that meeting, the court admonished defense counsel for not including certain information contained within the government's response in the defendant's motion to suppress (that firearms were plainly visible in the open bed of Mr. Wagoner's truck). The defense does not agree that the facts alleged in the government's motion are true. As such, the defense did not include these allegations in the defendant's motion.

The defense has an obligation to challenge zealously the government's theory and the facts it alleges. *See generally* MODEL RULES OF PROF'L CONDUCT R. 1.3 at comment 1. Counsel cannot simply adopt the police's cursory statements in discovery as absolute truth. It is true that Mr. Wagoner was driving a pickup truck that had an open-air bed. But the court should not conclude, prior to a hearing, that firearms or ammunition were in plain view within that vehicle. There is yet no evidence of such before the court. Instead, police failed to document their observations with specificity, did not take a single photograph, and appear to have purposely turned off their recording devices while claiming to observe the firearms. The only support for the government's position is a cursory statement in discovery from one officer that he observed firearms in the bed of a truck. And many other statements in that report appear to be false or misleading. The defense has a good faith basis and an obligation to question the officers' actions and their statements.

"[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.' *Anders v. California*, 386 U.S. 738 (1967). The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted ... the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *United States v. Cronic*, 466 U.S. 648, 656–657 (1984) (footnotes omitted).

space after leading police on a high-speed chase, Mr. Wagoner simply parked his pickup (with the ignition turned off) in his mother's driveway, and calmly told police (in response to police pointing a pistol at him and shouting) that he was going to his mother's house just down the road. Parking one's car, even if the door is left open (which counsel has seen many a person do inadvertently, especially when distracted, as Mr. Wagoner may have been by the officer's firearm and loud shouting demeanor) does not equate to abandoning a privacy interest in it. And while Mr. Wagoner did not stop immediately for the police, he simply drove for less than a minute at a slow pace from the road to his mother's driveway—hardly a "high-speed" chase. Finally, Mr. Wagoner only began running from the officer when the officer shouted that he would "fucking pepper spray [him]." Mr. Wagoner's actions in no way indicate that he abandoned any interest he had in his pickup.

**The officers cannot rely on a subsequent warrant if they obtained the basis of that warrant from an unreasonable search.**

*Leon* does not allow police to unreasonably search to obtain the basis of a search warrant, and then claim reliance on that search warrant to uncover the evidence that they already knew about. *United States v. Leon*, 468 U.S. 897 (1984) The cases that the government cites in support of its position are inapposite to the current circumstance. Generally, courts that apply *Leon* to these scenarios require the initial violation to be "close enough to the line of validity" to permit police to rely on warrants that were based on those violations. *See United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005).  No court has held that police can flagrantly violate the fourth amendment by conducting a warrantless search and then rely on a warrant obtained solely from the observations made while conducting the initial warrantless search. To allow such conduct would completely vitiate the requirement that police obtain a warrant to conduct a search. The exception would swallow the rule.

## Conclusion

Police now claim to have observed firearms in plain view in Mr. Wagoner's passenger compartment and the bed of his truck. They previously indicated in written reports they only observed the firearms in the passenger compartment when looking through it to ensure that nobody else was hiding in the truck. But that claim is inconsistent with the evidence: when Lt. Hambrick looked through the pickup, he already knew that another officer had seen firearms in the passenger compartment and that nobody else was inside it. His actions cast doubt on his later assertion that he observed firearms in plain view in the bed of the pickup—an assertion not made until the government filed its response to the defendant's motion. The court should defer judgement on the veracity of the officers' claims until hearing their testimony and the evidence presented from the defense, including impeachment evidence of the officers' credibility.

Respectfully submitted,
By: /s/ Benjamin M. Schiffelbein
    /s/ Monica D. Cliatt

Benjamin M. Schiffelbein, Esquire
Asst. Federal Public Defender
NH Bar No. 267593
Benjamin_Schiffelbein@fd.org

MONICA D. CLIATT, Esquire
First Asst. Fed. Public Defender
PA Bar No. 84848
210 First Street SW, Suite 400
Roanoke, VA 24011
Tel: (540) 777-0880
Email: monica_cliatt@fd.org

**Certificate of Service**
I certify that I filed this motion through the court's CM/ECF system on July 2, 2021.

/s/ Benjamin Schiffelbein